**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| JANICE S. MARTEN and CHRISTOPHER MARTEN, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:12-cv-00195-TWP-TAB |
| ANDREW W. SWAIN and RICK ALBRECHT, | ) ) | |
| Defendants. | ) ) | |

**ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on a Motion for Summary Judgment filed pursuant to Federal Rule of Civil Procedure 56 by Defendants Andrew Swain ("Swain") and Rick Albrecht ("Albrecht") (Filing No. 105). In addition, Plaintiffs' Motion for Leave to Withdraw an Exhibit (Filing No. 165) is pending. Following a tax audit of J.S. Marten, Inc., a jewelry business owned and operated by Plaintiff Janice S. Marten ("Ms. Marten"), a civil enforcement action ensued as well as criminal proceedings against Ms. Marten and her husband, Plaintiff Christopher Marten ("Mr. Marten") (collectively, "the Martens"). The criminal cases against the Martens were eventually dismissed with prejudice based on discovery abuses by the State of Indiana. Following dismissal of their criminal cases, the Martens initiated this action for malicious prosecution and other claims against Swain, a deputy attorney with the Indiana Attorney General's Office, and Albrecht, an auditor for the Indiana Department of Revenue ("IDOR"). After motions to dismiss, an appeal, and remand and mandate from the Seventh Circuit, Swain and Albrecht filed this Motion for Summary Judgment, asserting immunity and that the malicious prosecution claim is not supported by the evidence. For the following reasons, the Court **grants in part and denies in part** the Motion for Summary Judgment.

# I.   BACKGROUND

The following facts are not necessarily objectively true, but, as required by Federal Rule of Civil Procedure 56, the facts are presented in the light most favorable to the Martens as the non-moving party. *See Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Ms. Marten owned and operated a jewelry store through a corporate entity named J.S. Marten, Inc. from the mid-1990s until 2009 when the company was dissolved and the store closed. Ms. Marten was the president of J.S. Marten, Inc. throughout the entire duration of the company's existence, and her husband, Mr. Marten, was the company's vice president for a period of time. As the owner, Ms. Marten was the sole shareholder of the company.  J.S. Marten, Inc. sold jewelry at its brick and mortar store located in Carmel, Indiana as well as through email, its website, and by telephone sales.  The company also provided services such as jewelry repairs and appraisals (Filing No. 79 at 3; Filing No. 107-1 at 3–4; Filing No. 153-1 at 19).

The Martens used two computer software programs in the operation of the jewelry business: Edge, a point-of-sale system that tracked inventory and sales, and Quicken, a form of accounting software.  The Martens used the information generated by these software programs to report the sales tax owed to the State of Indiana (Filing No. 153-1 at 41; Filing No. 153-2 at 30; Filing No. 153-3 at 11).

By letter dated December 1, 2006, IDOR received an anonymous tip from someone identifying themselves as "Sales staff" of J.S. Marten, Inc., indicating that the company was "committing fraud, the owners are hiding sales, cash sales are not reported, cost of jewelry will show large purchases and no sales for the same jewelry, this is in the millions of dollars hidden from the state in sales."  (Filing No. 107-3 at 9.)

Albrecht was employed as an auditor with IDOR for thirty-one years, beginning in 1980. In response to the anonymous letter received from "Sales staff," in December 2006, Albrecht was assigned to complete an audit and investigation of J.S. Marten, Inc.  The purpose of the investigation was to determine whether the company had properly reported sales tax and tax-exempt sales (Filing No. 153-4 at 9, 12, 14).  On December 29, 2006, Albrecht mailed an audit engagement letter to J.S. Marten, Inc. to the attention of Janice Marten.  The letter provided notice that IDOR was going to conduct an audit of J.S. Marten, Inc. for the years 2003, 2004, 2005, and 2006 and requested that the company provide records, including "federal tax returns, general ledger, sales journal, purchase journal, sales invoices, purchase invoices, bank statements, payroll documents to include forms W-2, Wh-1, UC-5, and payroll ledger."  (Filing No. 107-4 at 10.)  The letter also asked Ms. Marten to contact Albrecht to arrange a start date for the audit.  *Id.*

Albrecht and Ms. Marten first spoke about the audit and investigation in January 2007, and Albrecht told Ms. Marten what kind of records he needed to see.  Ms. Marten provided Albrecht with her general ledger and sales tax financials (Filing No. 153-4 at 13).  Ms. Marten also gave Albrecht a copy of a disk containing electronic records for the company, which Ms. Marten believed contained all the records Albrecht was requesting for the audit (Filing No. 153-1 at 58, 61–62, 63).

After reviewing the general ledger and sales tax financial documents initially provided, Albrecht noticed discrepancies between the sales reported on the general ledger and the other documents.  He also noticed that gross sales, including tax-exempt sales, were not matching up with the IDOR records for the company.  His initial investigation disclosed preliminary findings that J.S. Marten, Inc. reported almost 80% of all its sales were tax-exempt (Filing No. 107-4 at 2).

On April 25, 2007, Albrecht met with Ms. Marten to discuss the need for additional records—sales invoices and bank notes—to complete the sales tax audit.  Albrecht told Ms. Marten that IDOR would need J.S. Marten's sales invoices to determine if J.S. Marten actually had out-of-state sales that would qualify for the sales tax exemptions that it reported.  Ms. Marten advised that additional records were in the basement of her house (Filing No. 153-4 at 14; Filing No. 107-4 at 11).  Albrecht also informed Ms. Marten that he was having trouble opening the disk that contained electronic records of the company, so Ms. Marten helped him with the disk (Filing No. 153-1 at 59–60).  Albrecht requested additional records and followed up with Ms. Marten via letter on June 11, 2007.  In the follow-up letter, Albrecht informed the Martens if additional records cannot be available by July 2, 2007, he would complete the audit report with the information that he currently had in his possession (Filing No. 107-4 at 11).

When Albrecht and Ms. Marten met in April, she discussed with him several family challenges that she was having at that time, which made it difficult to manage the affairs of the company.  Her daughter had been diagnosed with cancer, so Ms. Marten was traveling back and forth to California to help her daughter.  Ms. Marten also was taking care of her mother who had Alzheimer's disease (Filing No. 153-1 at 63–65).  Albrecht has no recollection of Ms. Marten telling him about her family health challenges (Filing No. 153-4 at 14).

Because no additional documents were provided after the June 11, 2007 letter, Albrecht went to the Carmel store on July 13, 2007, to follow up with Ms. Marten.  She was not at the store when Albrecht visited, so Albrecht left his business card with a request that Ms. Marten call him.  Ms. Marten did not contact Albrecht, so he sent another follow-up letter to her on August 28, 2007 (Filing No. 107-4 at 3).  In the letter, Albrecht informed Ms. Marten that he would be completing the audit by September 15, 2007, and if she did not provide sales invoices to support the claim for

tax-exempt sales, he would disallow those exemptions in the audit (Filing No. 107-4 at 12).  These additional documents were not provided to Albrecht.

Throughout Albrecht's investigation, the Martens were in frequent contact with another employee of IDOR, Iva Newsom, a tax analyst with whom the Martens had a previous relationship through volunteering at a food pantry.  Iva Newsom told the Martens that she understood the effort it takes to get all the requested information together and frequently told Mr. Marten that she would "take care of the matter" and help the Martens with the tax matter.  (Filing No. 153-2 at 37–54).

On September 18, 2007, Albrecht completed his investigation and audit of J.S. Marten, Inc. and delivered his audit report to IDOR (Filing No. 153-5; Filing No. 153-4 at 15).  After Albrecht completed the audit, IDOR officials continued to seek additional records from the Martens.  IDOR deputy director Steven Lasher sent a letter to Ms. Marten on December 28, 2007, requesting sales invoices, but Ms. Marten did not respond to his letter.  IDOR investigator Larry Harshman served an administrative subpoena on Ms. Marten on January 28, 2008, requesting records, including sales invoices, to be produced to IDOR by February 22, 2008.  However, on February 21, 2008, Ms. Marten called Albrecht to ask for a one-week extension to provide the requested records. Albrecht told Ms. Marten that a one-week extension would be provided, and he offered to pick up the records if she did not want to ship them or bring them to IDOR's office (Filing No. 107-4 at 4).

Ms. Marten assembled several records of J.S. Marten, Inc. and packed them into a large box to be produced to IDOR.  On February 25, 2008, Mr. Marten delivered the box of company records to IDOR's office.  He gave the box of records to two individuals at IDOR and asked that they give the box to Iva Newsom since he had been communicating with her about the tax matter (Filing No. 153-2 at 47–54).

5

It appears that the Martens' delivery of the box of records to IDOR was not communicated to Albrecht or Harshman because, on February 29, 2008, Albrecht went to the jewelry store with Investigator Harshman to collect records and sales invoices from Ms. Marten. Ms. Marten was not at the store at the time, so Albrecht left his business card with an employee and requested that Ms. Marten contact him before the end of the day. Later that day, at 5:10 p.m., Mr. Marten left a voicemail message for Albrecht, indicating that Ms. Marten was serving jury duty (Filing No. 107-4 at 4).

On March 28, 2008, Defendant Swain (then chief counsel for the tax litigation division of the Indiana Attorney General's Office) filed a verified petition in the Hamilton Superior Court to enforce the administrative subpoena to obtain records (Filing No. 107-5 at 2). Three days later, on March 31, 2008, Swain sent an email to others in the Indiana Attorney General's Office, indicating that IDOR was taking the case against the Martens seriously and that it "might go criminal." (Filing No. 153-8.)

On April 14, 2008, a hearing on Swain's verified petition was held. A Hamilton County judge entered an order directing the Martens to produce documents requested by the administrative subpoena. Both Swain and Albrecht were at the hearing, and Albrecht recalls the Martens producing six boxes of records to the Indiana Attorney General's Office at the hearing. Albrecht recalls the Attorney General's Office taking the boxes after the hearing, but he did not know what happened with the boxes after that and he never saw them after they were taken from the courthouse. According to Albrecht, the boxes should have been given to IDOR for agent review; however, after leaving the courthouse, Albrecht never saw the boxes again. (Filing No. 153-4 at 21). Albrecht did not personally request the boxes for review because management "would scream at you and didn't want to hear anything." *Id.* Swain recalls that the boxes were transported back

6

to the Attorney General's Office, and the records were reviewed by himself and other attorneys working on the Martens' case.  On January 29, 2010, during the criminal suppression hearing, Swain testified that his office determined the records were not responsive to the subpoena because there were no sales tax records, sales invoices, shipping records, sales tax returns, or other relevant documents (Filing No. 168-13 at 9).

At the request of Swain, on May 2, 2008, Albrecht prepared two subpoenas to be delivered to the Martens for them to be deposed (Filing No. 153-4 at 22).  Because of various personal reasons, Ms. Marten's deposition was continued twice and Mr. Marten's deposition was continued once.  However, when Ms. Marten asked to continue Mr. Marten's deposition a second time so that he could take her to a doctor's appointment at the Mayo Clinic, Swain refused to continue the deposition.  Mr. Marten apologized in an email for any inconvenience rescheduling would cause and stated that "after twenty-seven years of marriage, my wife and her health must come first." (Filing No. 153-10).  Mr. Marten did not appear for his deposition on May 22, 2008, and in response, Swain emailed other IDOR officials, stating, "We need to meet asap to discuss our next step.  Can we issue a je[opardy] assessment and shut the bus[iness] down.  I think we can file criminal charges now."  (Filing No. 153-10).

IDOR contacted the Hamilton County Prosecutor's Office to discuss pursuing a search warrant and possible criminal charges against the Martens.  (Filing No. 153-9 at 38).  Then Swain and Albrecht met with the Hamilton County Prosecutor's Office regarding criminal charges against the Martens on May 30, 2008 (Filing No. 153-4 at 30).  Swain informed the Hamilton County Prosecutor's Office that he was going to be taking the civil depositions of the Martens. Then on June 3, 2008, Swain emailed other individuals working on the Martens' case, explaining, "[a]s we discussed, the Hamilton Co. prosecutor is going to pursue criminal tax charges against

these guys." (Filing No. 153-14.)  He also explained that "[t]he prosecutor asked me to see if I could locate all the properties that they own.  They are going to execute search warrants to seize business records."  *Id.*  On June 4, 2008, Swain emailed the Hamilton County Prosecutor's Office to explain that Ms. Marten was going to appear for her deposition later that week, that she was not represented by an attorney, and that he would let them know how things went at the deposition (Filing No. 153-15).

With an understanding that the criminal process was underway, Swain deposed Ms. Marten on June 6, 2008.  Ms. Marten did not have an attorney, and Swain did not inform her of her right to have an attorney or that a criminal investigation had begun.  Albrecht was present at Ms. Marten's deposition.  Swain elicited testimony from Ms. Marten wherein he believed she admitted to several felonies.  Swain emailed others at IDOR three days after the deposition, asserting that he "deposed the prospective defendant," that she "admitted to several felonies," and that he was going to give the deposition to the prosecutor (Filing No. 153-17).  On June 11, 2008, Swain took the deposition of Mr. Marten.  Soon thereafter, Swain provided the two depositions to the Hamilton County Prosecutor's Office (Filing No. 153-11).

Following the Martens' depositions, at which Albrecht was present, Albrecht signed a probable cause affidavit to support petitions for search warrants of the Martens' residence and business.  Albrecht's probable cause affidavit was based on his understanding that the Martens failed to produce sales invoice records to IDOR pursuant to the Hamilton County court's order and a failure to permit the examination of such records (Filing No. 107-4 at 5).  On July 2, 2008, search warrants were issued for the Martens' residence and business.  *Id.* at 25–28.

The search warrants were executed at the Martens' residence and business on July 10, 2008. Both Albrecht and Swain were present during the search.  Swain oversaw the execution of

the warrants and the seizure of evidence (Filing No. 153-22 at 8).  Swain's responsibility during

the search was to label and package evidence, help identify which materials should be seized, and

generally oversee the search (*Id.*; Filing No. 153-20; Filing No. 153-21 at 198–99).  During the

search, Albrecht served Ms. Marten with jeopardy warrants, which notified her of the amount

IDOR claimed she owed and allowed IDOR to "seize our money" before she could move it out of

state (Filing No. 153-4 at 5).

After the search and seizure of records, IDOR auditors examined the records seized and

drafted a case report dated October 9, 2008.  The case report noted that invoices existed for sales

transactions that did not charge sales tax or alternatively provide an explanation for a sales tax

exemption.  The case report also noted that sales tax collected was greater than the amount of tax

reported to IDOR (Filing No. 107-7).

On October 16, 2008, Swain sent an email to IDOR officials stating he had just finalized

and signed a probable cause affidavit in support of arrest warrants for the Martens (Filing No. 153-

28).  Swain noted that they might want to discuss a press release and whether they wanted an IDOR

or Attorney General official present when the arrests were made. *Id.*  In his probable cause

affidavit, Swain noted that he was assigned the responsibility of coordinating and conducting the

tax investigation of J.S. Marten, Inc. and the Martens (Filing No. 153-22).  Swain averred that the

Martens failed to produce subpoenaed documents by February 29, 2008.  His probable cause

affidavit also included incriminating information obtained from the Martens when he deposed

them four months earlier.  *Id*.

The same day that Swain signed the probable cause affidavit, Swain learned via email that

IDOR had reached an agreement with the Martens to resolve the dispute concerning their sales tax

liability. The Martens were to pay an initial deposit of $100,000.00 with additional payments to

be made to satisfy the balance.  Swain responded to the email by explaining that he could not "keep pulling the prosecutor on and off" and that "[m]oney does not make the underlying crimes go away." Swain insisted that the criminal prosecution needed to continue (Filing No. 153-28).

After Swain signed the probable cause affidavit, the Hamilton County Prosecutor's Office filed criminal charges against the Martens.  The Hamilton County Superior Court issued arrest warrants for the Martens based on Swain's probable cause affidavit, and the Martens were arrested on October 23, 2008.

Joshua Kocher ("Kocher"), an attorney with the Hamilton County Prosecutor's Office, prosecuted the criminal case against the Martens.  He described Swain's role in the criminal proceedings as the "State's witness," the "victim," and a liaison between the Hamilton County Prosecutor's Office and the State agencies.  Swain facilitated meetings when Kocher wanted to examine the evidence.  When the Martens requested discovery in the criminal case, Kocher forwarded the requests to Swain to obtain the responsive material (Filing No. 153-33 at 24, 28, 37, 38).

Various discovery disputes arose during the course of the criminal case against the Martens.  The Martens were having difficulty obtaining materials from Kocher, IDOR, and the Attorney General's Office.  The Martens sought court intervention with the discovery issues, and the court ordered the State to give the Martens' attorneys "unfettered access to the Department of Revenue's records related to the Martens."  (Filing No. 153-33 at 38.)

Carole Buchholz ("Buchholz") was the IDOR auditor assigned to work on the Martens' file during the criminal proceedings.  Swain asked Buchholz to work on various matters connected with the criminal case.  On August 5, 2009, Swain instructed Buchholz to assist the Martens' attorneys with locating records in IDOR's evidence room.  The Martens' attorneys asked for

information regarding the civil audit assessment prepared by Albrecht, and Swain instructed Buchholz not to provide this information to the attorneys despite the court's order to provide "unfettered access to the Department of Revenue's records related to the Martens." (Filing No. 153-37.)

In her criminal case, Ms. Marten filed a motion to compel on August 21, 2009, and after a hearing on the motion, the court granted the request to compel discovery on September 14, 2009. The court noted that "this is about the fifth time we've had an extensive discovery discussion on this case . . . on an automatic discovery rule that requires complete discovery within thirty days [] after [defense counsel enters his appearance]." (Filing No. 153-40 at 1–2 (brackets and ellipsis in original).) The court's order also warned that dismissal of the criminal case was a possible sanction for any unjustified failure to comply with the discovery order. *Id.* at 2.

The court held another hearing on discovery issues on November 5, 2009, and the court warned that the criminal case would be dismissed if discovery revealed that "even one document that already should have been disclosed to Marten" had been withheld. *Id.* at 3. The court explained that, if documents finally were produced that the Martens had not been given and that were favorable to their case, the court would dismiss the criminal case and "more importantly, I will consider the actual imposition of financial sanctions against Mr. [Andrew] Swain." *Id.* (brackets in original).

Ms. Marten also filed a motion to suppress certain evidence on July 17, 2009, and after a hearing on the motion, the court granted the request to suppress Ms. Marten's deposition testimony taken by Swain on June 6, 2008. The court noted,

> At no time during the deposition did Andrew Swain . . . ever notify or provide any warning to Janice Marten that his client, the Indiana Department of Revenue was considering criminal prosecution or that the State of Indiana, through the Hamilton County Prosecutor, was pursuing criminal proceedings and had requested Mr.

Swain to gather information on properties owned by the Defendant to facilitate that process. The deposition transcript indicates Mr. Swain provided the investigatory services requested by the Hamilton County Prosecutor during the deposition.

(Filing No. 153-41 at 3–4.)  In determining that suppression of Ms. Marten's deposition was appropriate, the court concluded,

> [Ms. Marten's] deposition was compelled by subpoena by Deputy Attorney General Andrew Swain, counsel of record for the Indiana Department of Revenue in a "civil enforcement" proceeding, after said Attorney for the State of Indiana had actual knowledge that a criminal proceeding was being pursued by another attorney for the State of Indiana, the Hamilton County Prosecutor. . . . [E]ven more troubling is that Andrew Swain had apparently agreed with the Hamilton County Prosecutor to obtain information from Defendant Janice Marten helpful to the pursuit of this very criminal prosecution. Three days later, Andrew Swain took the instant deposition and asked the Defendant several questions which sought to elicit incriminating information, all without a warning to the Defendant of what he was doing for the Hamilton County Prosecutor. . . . These intentional actions by Andrew Swain, under the guise of a compelled deposition in a "civil enforcement action", violated the Defendant's Fifth Amendment rights against self incrimination and further violated the Defendant's fundamental right to due process.

*Id.* at 5–6.

On October 14, 2010, the Martens' criminal cases were dismissed with prejudice (Filing No. 153-35 at 13; Filing No. 153-36 at 12–13).  In the order dismissing Ms. Marten's criminal case, it was explained,

> [T]he Court has repeatedly and pointedly expressed its disapproval with the State's conduct on discovery issues in this case—and still, even after two orders compelling discovery, the State persists in dragging its feet in discovery. The Court has expressly warned the State that dismissal would occur if even one document compelled by the First Order to Compel was not disclosed—and still the State has dragged its feet in discovery, failing, at a minimum, to disclose the Case Activity Report of Rick Albrecht as expressly required by the First Order to Compel. The Court has expressly warned the State that dismissal would occur if even one document favorable to Marten appeared in the production required by the First Order to Compel—yet those disclosures contained an email . . . in which Indiana Attorney Andrew W. Swain . . . demonstrated that he had actual knowledge that criminal proceedings were in the making when he deposed Marten pursuant to this Court's order in a civil enforcement action in June 2008. Compare Exhibit C, Supplemental Designation of Evidence in Support of Defendant's Motion to Suppress and Dismiss (filed February 1, 2010) (email sent by Swain on June 3,

2008, three days before he deposed Marten pursuant to an order compelling her to testify, in which Swain stated, as a definite fact, that "the Hamilton County Prosecutor is going to pursue criminal tax charges against these guys [i.e., Marten and her husband, Christopher]") (emphasis added) with Record of Hearing (January 29, 2010 at approximately 11:36 a.m.) (on redirect examination on his June 3, 2008 email, Swain unequivocally disavowing having had any knowledge on June 3, 2008 that the Hamilton County Prosecutor planned to file criminal charges against Marten and her husband). Even in the face of the Court's repeated expressions of disapproval, the State now also has failed to comply, fully and without evasion, with the Order Compelling Disclosure of 449 Documents. On this record, then, the Court finds that dismissal of all pending charges against Marten is indeed "just."

(Filing No. 153-40 at 7–8.)  Final dismissal in the Martens' criminal cases occurred in January and March 2011 (Filing No. 153-35 at 14; Filing No. 153-36 at 13).

Following the dismissal of the criminal cases against them, on February 15, 2012, the Martens initiated this action against Swain, Albrecht, the Indiana Attorney General's Office, and IDOR for violations of the Fourth, Fifth, Sixth, and Fourteenth Amendments under 42 U.S.C. §§ 1983 and 1985.  The Martens also asserted claims for malicious prosecution, intentional infliction of emotional distress, abuse of process, and conversion (Filing No. 1).

The four defendants filed a motion to dismiss, which the Court granted on October 22, 2012 (Filing No. 35).  On October 26, 2012, the Martens amended their Complaint to assert a state law claim against Swain, Albrecht, and the State of Indiana for malicious prosecution (Filing No. 37).  The three defendants filed another motion to dismiss, which the Court granted on June 20, 2013.  The Court determined that Swain and Albrecht had immunity under the Indiana Tort Claims Act against the state law claim for malicious prosecution, and the State of Indiana enjoyed Eleventh Amendment immunity.  The Court also noted that the Martens were not without any recourse against Swain and Albrecht because they could, and did, assert a Section 1983 claim; however, that claim had been dismissed as untimely after the Defendants' first motion to dismiss (Filing No. 50 at 6).

13

The Martens appealed the dismissal of their action to the Seventh Circuit Court of Appeals. The Seventh Circuit noted that "[t]he Martens' sole argument on appeal is that the district court erred in dismissing their § 1983 due-process claim for malicious prosecution as time-barred under the two year statute of limitations."   (Filing No. 69 at 6.)   The Seventh Circuit determined that dismissal of the Martens' Section 1983 claim based on the expiration of the statute of limitations was incompatible with the Seventh Circuit's recent decision in *Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013), which was decided after this Court had dismissed the Martens' Section 1983 claim on October 22, 2012.  The Seventh Circuit did not address the Martens' state law claims or the claims against any of the defendants other than Swain and Albrecht.  Therefore, the remand and mandate concerned only the Section 1983 malicious prosecution claim against Swain and Albrecht (Filing No. 69 at 6 n.1, 8).

The Seventh Circuit also briefly addressed Swain's argument regarding absolute prosecutorial immunity:

> Finally, Swain asks us to affirm the dismissal of the § 1983 claim against him because his position as prosecutor furnishes absolute immunity. The Supreme Court has characterized prosecutorial immunity from suit under § 1983 as "absolute." *Van de Kamp v. Goldstein*, 555 U.S. 335, 341–42 (2009) (noting that "[t]he public trust of the prosecutor's office would suffer were the prosecutor to have in mind his own potential damages liability when making prosecutorial decisions" (internal quotation marks omitted)). But this "immunity may not apply when a prosecutor is not acting as an officer of the court, but is instead engaged in other tasks, say, investigative or administrative tasks." *Id.* at 342 (internal quotation marks omitted). Thus, it's "the nature of the function performed, not the identity of the actor who performed it, that inform[s] our immunity analysis." *Forrester v. White*, 484 U.S. 219, 229 (1988).
>
> We are hesitant to engage in this functional analysis at the pleading stage, particularly where the district court has yet to pass on the issue. . . . On the complaint alone, we cannot conclude with any certainty whether and to what extent Swain is entitled to immunity.

(Filing No. 69 at 7–8.)

After the remand from the Seventh Circuit, the Martens amended their Complaint to make it consistent with the sole surviving claim for malicious prosecution under Section 1983 against Swain and Albrecht (Filing No. 79).  Then Swain and Albrecht filed their Motion for Summary Judgment, asking the Court for judgment on the Section 1983 malicious prosecution claim based on immunity, the existence of probable cause, and a lack of malice (Filing No. 105).

## II.   <u>SUMMARY JUDGMENT STANDARD</u>

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Federal Rule of Civil Procedure 56 provides that summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Hemsworth v. Quotesmith.com, Inc.*, 476 F.3d 487, 489–90 (7th Cir. 2007).  In ruling on a motion for summary judgment, the court reviews "the record in the light most favorable to the non-moving party and draw[s] all reasonable inferences in that party's favor." *Zerante*, 555 F.3d at 584 (citation omitted). "However, inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion." *Dorsey v. Morgan Stanley*, 507 F.3d 624, 627 (7th Cir. 2007) (citation and quotation marks omitted). Additionally, "[a] party who bears the burden of proof on a particular issue may not rest on its pleadings, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact that requires trial." *Hemsworth*, 476 F.3d at 490 (citation omitted). "The opposing party cannot meet this burden with conclusory statements or speculation but only with appropriate citations to relevant admissible evidence." *Sink v. Knox County Hosp.*, 900 F. Supp. 1065, 1072 (S.D. Ind. 1995) (citations omitted).

15

"In much the same way that a court is not required to scour the record in search of evidence to defeat a motion for summary judgment, nor is it permitted to conduct a paper trial on the merits of [the] claim." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001) (citations and quotation marks omitted). "[N]either the mere existence of some alleged factual dispute between the parties nor the existence of some metaphysical doubt as to the material facts is sufficient to defeat a motion for summary judgment." *Chiaramonte v. Fashion Bed Grp., Inc.*, 129 F.3d 391, 395 (7th Cir. 1997) (citations and quotation marks omitted).

## III.   DISCUSSION

Swain and Albrecht argue that they are entitled to summary judgment in their favor because they enjoy qualified immunity, and Swain, as a state prosecutor, enjoys absolute immunity. They also argue that they are entitled to judgment because the Martens' malicious prosecution claim is not supported by any evidence of malice and their conduct was supported by probable cause. The Court will address each of these arguments in turn.[1]

## A.   Swain's Absolute Immunity

Swain asserts that he is entitled to absolute immunity because he was serving as a state prosecutor, and therefore, he has absolute prosecutorial immunity. He points out that "[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity." *Imbler v. Pachtman*, 424 U.S. 409, 419 n.13 (1976). Swain asserts that the Supreme Court has recognized that prosecutors performing their prosecutorial functions are entitled to absolute immunity when faced with claims brought under 42 U.S.C. § 1983, pointing

---

[1] Swain and Albrecht also argued that the State of Indiana is entitled to summary judgment under Eleventh Amendment immunity because the Martens' Third Amended Complaint (Filing No. 79) listed the State of Indiana as a defendant even though the remand from the Court of Appeals did not include claims against the State. After the summary judgment motion was filed, the Martens' acknowledged that the State of Indiana is no longer a party to this action (Filing No. 130). Therefore, the Court granted the defendants' motion to withdraw their summary judgment argument regarding the State of Indiana and to update the case caption to reflect that the only defendants are Swain and Albrecht (Filing No. 131).

to *Imbler*, 424 U.S. at 427.  "[I]n initiating a prosecution and in presenting the State's case, the prosecutor is immune from a civil suit for damages under § 1983." *Id.* at 431.  Swain notes that, when determining whether absolute prosecutorial immunity applies, the Court must rely not upon that official's position in government but rather on a review of the nature of the functions the official was performing in the case.  *See Butz v. Economou*, 438 U.S. 478 (1978).

Swain argues that he was performing functions traditionally viewed as prosecutorial, and thus, he should be afforded absolute immunity.  He points out that he was charged with the duty to represent IDOR in the civil proceedings against J.S. Marten, Inc. and the Martens.  In this role, he utilized his legal and tax expertise to decide whether the Martens' conduct was lawful and to decide whether to prepare and file documents to enforce the administrative subpoena, seek search warrants, and prepare probable cause affidavits.  Swain argues that these functions are not administrative or investigative in nature and are not outside the scope of prosecutorial duties.  Thus, Swain asserts, he was performing the exact functions of a prosecutor that were intended to be protected by an absolute immunity.

The Martens respond to Swain's argument by explaining "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).  The Court must look to the functions being performed in the case. *Van de Kamp*, 555 U.S. at 342.  "[W]hen a prosecutor is not acting as an 'officer of the court,' but is instead engaged in other tasks, say, investigative or administrative tasks," then he is not entitled to absolute immunity. *Id.*

The Martens acknowledge that Swain was authorized to prosecute civil actions on behalf of IDOR and in the name of the State of Indiana.  However, the Martens argue, Swain misses the mark when he claims an absolute immunity based on his prosecutorial role in the civil enforcement

17

action.  The Martens assert that it is the criminal cases that are the proper focus, and Swain is not entitled to absolute prosecutorial immunity because his function in the Martens' criminal cases was as an investigator and witness, not as an in-court advocate for the State.  Swain did not have any court-related duties in the Martens' criminal cases that could make him an "officer of the court."

The Martens point to testimony from Kocher, the prosecutor who handled the Martens' criminal cases, wherein he described Swain's role as a State witness and the victim.  Swain executed the search warrant against the Martens, and his duties were to label and package evidence, help identify which materials should be seized, and generally oversee the search.  The Martens point out that these are functions generally performed by police officers when executing search warrants.  They argue that Swain's participation in executing the search warrant was removed from the judicial process and was not a function performed by court advocates.

The Martens also assert that Swain provided extensive investigative advice to IDOR during its investigation and audit of the Martens.  Additionally, Swain prepared a probable cause affidavit that was used in support of arrest warrants to assist the prosecutor's criminal case against the Martens.  Swain signed the affidavit as the complaining witness, and the Martens point out that the Supreme Court unambiguously stated that absolute immunity does not apply when a government attorney serves as the complaining witness in support of a warrant.  *Van de Kamp*, 555 U.S. at 343 ("absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation" . . . "or when a prosecutor acts as a complaining witness in support of a warrant application").

The Martens further argue that Swain was not acting in a prosecutorial role during the Martens' criminal cases because he was serving instead as a witness.  When the Martens requested

access to evidence, the prosecutor would contact Swain to facilitate the examination of evidence, and the prosecutor would contact Swain when he had questions about the case. Furthermore, Swain provided testimony in the Martens' criminal case. The Martens explain that Swain performed the functions of a police officer, investigator, and witness in the criminal case, not the functions of a prosecutor.

Finally, the Martens also point to an email wherein the Indiana Attorney General's Office recognized the threat to immunity if Swain (or other prosecutors) participated in the execution of the arrest warrants, and they point to a case progress note wherein the Hamilton County Prosecutor's Office expressed concern that attorneys had participated in the execution of the search warrants (Filing No. 153-29; Filing No. 153-31). They assert that Swain made himself a witness rather than an advocate.

As the Supreme Court pointed out in *Buckley*,

> There is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand. When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other. Thus, if a prosecutor plans and executes a raid on a suspected weapons cache, he has no greater claim to complete immunity than activities of police officers allegedly acting under his direction.

*Buckley*, 509 U.S. at 273–74 (citations and quotation marks omitted).

Upon review of the designated evidence in this case, the Court determines that there is no genuine dispute of material fact that Swain was acting outside the prosecutorial role when he served as a witness and an investigator in the Martens' criminal cases. The evidence and examples pointed out by the Martens and noted above show that Swain was acting as a witness and an investigator in the criminal cases.

Additionally, Swain took the depositions of Ms. Marten and Mr. Marten under the guise of the civil enforcement action while he knew that the Hamilton County Prosecutor's Office was pursuing criminal charges. He knew that the prosecutor was looking for certain information to advance the criminal case, and he asked questions during the depositions to elicit testimony from the Martens that would assist the criminal matter. This is similar to the function of a police officer interviewing a suspect during the investigation of a crime. Furthermore, Swain used the information that he gained through his investigatory efforts to draft a probable cause affidavit to support arrest warrant applications. Again, this is traditionally a function of law enforcement officers. *See Van de Kamp*, 555 U.S. at 343 ("absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation" . . . "or when a prosecutor acts as a complaining witness in support of a warrant application").

Concerning Swain's assertion of absolute prosecutorial immunity, the designated evidence in this case clearly points to only one result: Swain acted not as a prosecutor but as an investigator and witness in the Martens' criminal cases, and thus, he is not entitled to absolute immunity in this Section 1983 malicious prosecution case.

**B.    Swain's and Albrecht's Qualified Immunity**

As Swain and Albrecht correctly assert, government officials are entitled to qualified immunity from suits brought against them for damages under Section 1983 "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The qualified immunity defense allows for error in judgment and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Swain and Albrecht claim that they are entitled to qualified immunity against the Martens' Section 1983 claim because there is no such thing as a constitutional right not to be prosecuted without probable cause.  In support of this assertion, Swain and Albrecht point to *Ray v. City of Chicago*, 629 F.3d 660 (7th Cir. 2011) and *Tully v. Barada*, 599 F.3d 591 (7th Cir. 2010).  They note that, to support a viable malicious prosecution claim under Section 1983, the Martens must show a predicate constitutional violation beyond just prosecution without probable cause.  *See Welton v. Anderson*, 770 F.3d 670, 673 (7th Cir. 2014); *Serino v. Hensley*, 735 F.3d 588, 592 (7th Cir. 2013).  Swain and Albrecht then summarily assert that the Martens' malicious prosecution claim alleges only that they were prosecuted without probable cause, this does not amount to a violation of a clearly established constitutional right, and the designated evidence does not show a violation of any clearly established constitutional right.  Swain and Albrecht claim, therefore, that qualified immunity applies to them to bar the Martens' Section 1983 claim.

The Martens respond that the evidence shows violations of their clearly established constitutional rights beyond a mere prosecution without probable cause. First, the Fifth Amendment to the United States Constitution establishes that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself."  If an individual's compelled statements are used "to develop probable cause sufficient to charge [the individual] and initiate a criminal prosecution," then those statements have been used in a "criminal case" and violate that individual's Fifth Amendment rights.  *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1025–27 (7th Cir. 2006).

The Martens assert that, in Indiana, the Fifth Amendment is implicated when IDOR elicits information from a taxpayer via a subpoena after the matter already has been referred for criminal prosecution.  *See Green v. State*, 390 N.E.2d 1087, 1089–90 (Ind. Ct. App. 1979) ("at some point

a civil action to gather information to determine tax liability could turn into an inquisition to gather personal information from a taxpayer in order to criminally prosecute him for a tax offense," and "recommendation to the Attorney General for prosecution (or the initiation of such an action) can serve as notice that the process has become criminal"). The Martens point to a string of emails wherein Swain acknowledged and pushed for the criminal prosecution of the Martens. Swain's emails noted that the Martens' matter "might go criminal," "I think we can file criminal charges now," and the prosecutor "is going to pursue criminal tax charges." Swain's emails also informed the Hamilton County Prosecutor's Office that Ms. Marten would be deposed in the coming days and she would not have an attorney. Knowing that criminal charges were being pursued, Swain elicited testimony during the Martens' depositions that he believed were confessions to several felonies. He shared this information with the prosecutor and included the information within his probable cause affidavit. During the criminal case, the Martens argued that the depositions were taken improperly and asked that they be suppressed. The trial court granted the motion to suppress the deposition transcript, noting Swain's violation of the Martens' Fifth Amendment rights.

This evidence establishes that Swain did violate the Martens' clearly established constitutional rights provided by the Fifth Amendment, and thus, Swain is not entitled to qualified immunity against the Martens' Section 1983 claim. As additional bases to defeat qualified immunity, the Martens also assert that Swain violated their clearly established constitutional rights by providing false testimony during the proceedings to further the criminal cases, withholding exculpatory evidence during the criminal proceedings, and providing knowingly false testimony in his probable cause affidavit to support the arrest warrants. Because the Court already has determined that the Fifth Amendment violation removes Swain's qualified immunity in this action, the Court will address these additional arguments in other sections of this ruling.

Concerning Albrecht's qualified immunity, the Martens assert that the Constitution prohibits officers from knowingly making false statements in probable cause affidavits to support warrants, and qualified immunity will not protect officers who knowingly make such false statements if the statements were necessary to establish probable cause. *See Malley*, 475 U.S. 344–45; *Serino*, 735 F.3d at 594.

The Martens argue that Albrecht knowingly made false statements in his probable cause affidavit regarding the Martens' failure to produce "records" that had been requested as well as court-ordered. They argue that Albrecht admitted that his statements were incorrect and point to his deposition testimony. However, the testimony they point to does not support their claim that Albrecht knowingly provided false testimony in his affidavit. Rather, he was discussing sales invoices, which he never did receive, and that Ms. Marten had not provided the documents to him that he requested multiple times. His testimony further establishes that he did not review the contents of the six boxes the Martens brought to a hearing, so he did not know of their contents (Filing No. 153-4 at 35 (134:14–136:11)).

Albrecht's probable cause affidavit in support of the search warrants declared, "Janice Marten never provided to Auditor Albrecht the requested sales invoices," and IDOR had "requested the sales invoices," and if Ms. Marten "did not provide the requested business records," then further action would be taken (Filing No. 153-18 at 3). Albrecht's affidavit also declared that Ms. Marten "never delivered the subpoenaed records to Auditor Albrecht," and "Janice Marten has failed to produce the requested business records." *Id.* at 4.

The testimony that the Martens point to from Albrecht's deposition, when compared to the statements in Albrecht's probable cause affidavit, does not show that Albrecht knowingly provided false testimony in his affidavit. His affidavit statements were an accurate reflection of Albrecht's

knowledge based on what he had experienced during his investigation and involvement with the Martens' case.  While additional information and knowledge regarding records may have been held by other individuals involved in the case, this fact does not establish that Albrecht knowingly made false statements in his affidavit.

The Martens further claim that Albrecht testified that he "was not sure that the prosecutor would have sought the search warrant if they had known that Albrecht's statements were incorrect." (Filing No. 153 at 30–31.)  However, the testimony the Martens rely on for this claim says the opposite.  When asked whether the prosecutor would have sought the search warrants if he had known Albrecht's statements were incorrect, Albrecht responded, "They might still have, yes." (Filing No. 153-4 at 35 (136:12–17).)

The Martens' sole argument against Albrecht's qualified immunity is his allegedly knowingly false statements in his probable cause affidavit.  However, the designated evidence does not show that Albrecht knowingly made false statements in his probable cause affidavit to support the search warrants and that those allegedly false statements were necessary to establish probable cause.  The evidence does not support the claim that Albrecht violated clearly established constitutional rights of the Martens.  Thus, as a government official performing his official duties, Albrecht is entitled to qualified immunity against the Martens' Section 1983 claim.

Therefore, summary judgment is **granted** to Albrecht on the basis of his qualified immunity, and he is **dismissed** as a defendant in this action.  However, summary judgment based on absolute immunity and qualified immunity as to Swain is **denied**.

## C. Malicious Prosecution Claim

The Court now turns to the Martens' Section 1983 malicious prosecution claim against Swain.  As the Seventh Circuit has explained many times, "there is no such thing as a constitutional

right not to be prosecuted without probable cause.  Thus, [a plaintiff] must allege something else that does amount to a constitutional violation (even if he calls it malicious prosecution)."  *Serino*, 735 F.3d at 593.

As an initial matter, the Court notes that the Martens have satisfied this requirement of showing a constitutional violation beyond the allegation of being prosecuted without probable cause.  As discussed above, the evidence shows a violation of the Fifth Amendment right against self-incrimination.

Furthermore, constitutional violations noted to be missing in other cases are present in this case.  *See Reed v. City of Chi.*, 77 F.3d 1049, 1053 (7th Cir. 1996) (plaintiff "did not allege that the detectives gave perjured testimony at these hearings," "no allegations in the complaint that the detectives falsified any information or evidence," "[h]e did not allege that they discovered exculpatory evidence but withheld it from him," "no allegations that the detectives committed any improper acts after arresting [plaintiff] without probable cause"); *Serino*, 735 F.3d at 594 (no allegations that "recommendations were *knowingly* false, that he withheld exculpatory evidence from the prosecutor, or that he took steps to wrongfully further what he knew was a baseless prosecution").  The Martens designated evidence that suggests Swain provided false testimony in court when he unequivocally disavowed having any knowledge that the Hamilton County Prosecutor's Office planned to file criminal charges against the Martens, which contradicted Swain's earlier email wherein he stated the prosecutor "is going to pursue criminal tax charges." The Martens designated additional evidence that suggests Swain was responsible for withholding exculpatory evidence from the Martens during their criminal cases.

To support their Section 1983 malicious prosecution claim, the Martens must show that "(1) [they have] satisfied the elements of a state law cause of action for malicious prosecution; (2)

25

the malicious prosecution was committed by state actors; and (3) [they were] deprived of liberty."

*Welton*, 770 F.3d at 674.

> Under Indiana law, the elements of a malicious prosecution action are: (1) the defendant instituted or caused to be instituted an action against the plaintiff; (2) the defendant acted maliciously in so doing; (3) the defendant had no probable cause to institute the action; and (4) the original action was terminated in the plaintiff's favor.

*Id.* (citation and quotation marks omitted).

### 1. <u>Swain's Probable Cause Affidavit</u>

Regarding the malicious prosecution claim against Swain, Swain's argument focuses on the existence of probable cause to support his actions. He argues that his actions were supported by probable cause; therefore, the Martens cannot support their malicious prosecution claim. Because this is the only element of a malicious prosecution claim that Swain attacks, the Court will begin its discussion concerning this element.

Swain asserts that probable cause supported the applications for search warrants and arrest warrants. The search warrants and arrest warrants were obtained from the Hamilton County courts following a judge's consideration of the affidavits and a finding that probable cause existed. He argues that, because warrants were issued by a judge, there exists *prima facie* evidence of probable cause, which defeats the Martens' malicious prosecution claim. *See Conwell v. Beatty*, 667 N.E.2d 768, 778 (Ind. Ct. App 1996) ("[a] judicial determination of probable cause in a criminal proceeding constitutes prima facie evidence of probable cause in a subsequent malicious prosecution suit").

Swain points to many of the facts laid out in the "Background" section above regarding the audit and investigation of the Martens. He notes the alleged difficulty that IDOR experienced in obtaining records from the Martens. He asserts that the audit, investigation, slow production of

records, and discrepancies in the financial records further support probable cause that tax crimes had been committed by the Martens.  Swain also suggests that probable cause arose from the anonymous tip from the "Sales staff" of J.S. Marten, Inc. that the company was committing fraud and hiding sales, with millions of dollars of sales being hidden from the State.

Swain asserts that his actions were further supported by probable cause because he had the evidence from the search and seizure of the Martens' home and business and the October 2008 case report completed by IDOR auditors following the search and seizure.  The case report noted discrepancies in the Martens' tax records.  This additional evidence and investigation, Swain argues, provided him with probable cause to execute his affidavit in support of the arrest warrants. The arrest warrants were issued by a Hamilton County judge after finding that probable cause existed.  Under Indiana's tax laws, all these facts would lead a reasonable person to believe that the Martens had committed the crimes for which they were prosecuted.

In response, the Martens argue that, if IDOR, the Attorney General's Office, Albrecht, and Swain had undertaken a competent investigation, they would have discovered additional information that likely would have resolved their concerns about the Martens' tax records and practices.  With those concerns resolved, they likely would not have pursued criminal charges against the Martens. However, the Martens ignore the clear case law from the *Glass* case, which they cited for a different principle:  "When a judicial determination of probable cause has been made, the prima facie case cannot be overcome by a showing of a negligent failure to investigate thoroughly." *Glass v. Trump Indiana, Inc.*, 802 N.E.2d 461, 467 (Ind. Ct. App. 2004) (quoting *Conwell*, 667 N.E.2d at 778).  Therefore, this argument has no merit to support the Martens' claim.

The Martens acknowledge that judicial determinations of probable cause exist because the Hamilton County courts issued the search warrants and arrest warrants.  They argue, however, that

the judicial determinations of probable cause were improperly induced.  The Martens first contend that the search warrants were improperly obtained because Albrecht knowingly made false statements in his affidavit, and the judge likely would not have issued the warrants had Albrecht been truthful in his affidavit.  This argument was addressed above, with the Court determining that the evidence does not support the claim that Albrecht knowingly made false statements.

Regarding the arrest warrants, the Martens acknowledge that a judicial determination of probable cause in a criminal proceeding constitutes *prima facie* evidence of probable cause in a subsequent malicious prosecution suit; however, this evidence may be rebutted by evidence showing that "the finding of probable cause was induced by false testimony, fraud, or other improper means such as the defendant withholding material facts at the hearing."  *Glass*, 802 N.E.2d at 467.  The Martens assert that the arrest warrants were improperly obtained because Swain's probable cause affidavit contained false statements and omitted important facts.  In particular, the Martens assert that Swain misrepresented the facts when he averred that "neither Janice Marten nor Christopher Marten has produced to the Department or the OAG the subpoenaed records." (Filing No. 153-22 at 6.)  The Martens assert that Swain's affidavit falsely declared that they did not produce subpoenaed records, but Swain knew that they had produced six boxes of documents during a hearing.  Swain designates evidence that he reviewed the contents of the six boxes and alleges the documents received were not responsive to the subpoena (Filing No. 168-13 at 9).  However, in his affidavit, Swain failed to even mention that the six boxes were ever produced, that he reviewed the contents, or that documents produced were insufficient.  The Court determines that there exists a disputed issue of material fact regarding whether Swain's omissions constitute false testimony in the affidavit.

The Martens next assert that Swain's affidavit falsely declared that the Martens did not produce the subpoenaed records because Swain knew that IDOR had software and computers seized from the Martens, which contained sales records.  Swain contends that sales records on the Martens' computers that were in IDOR's possession showed "dates and sales amounts" from March 2001 to February 2002, March 2001 to October 2004, and November 2007 to May 2008, with no information for 2005 and 2006 (Filing No. 153-23).  The subpoena requested "[s]ales invoices, exempt sales documentation, and bank note or loan information to document loans that were reported on the general ledger as sales income" for the time period of "January 1, 2004 through December 31, 2006." (Filing No. 153-7 at 11.)  Swain argues that his assertion that the Martens did not produce the subpoenaed records was not false. However, Swain never mentioned in his affidavit that the computer software was produced, a disk was produced, that computers had been accessed, or that what he found on the computers was insufficient. Again, the Court determines that there exists a disputed issue of material fact regarding whether Swain's omissions constitute false testimony in the probable cause affidavit.

The Martens also assert that Swain testified falsely in the affidavit when he stated Ms. Martin "testified that she had destroyed the sales invoices pertaining to the tax years at issue." (Filing No. 153-22 at 7.)  Ms. Marten contends the only statement she made related to this subject in her deposition was that a computer crashed after her home was hit by lightning, so she no longer had access to emails concerning some of the internet sales for the tax years at issue (Filing No. 153-24 at 19–20), and she did not keep certain shipping invoices because she did not believe they were taxable sales. *Id.* at 34–35.  Moreover, Ms. Marten notes that she also testified that she kept some records of J.S. Marten, Inc.'s sales during the period in question, in particular the sales with independent contractors (Filing No. 153-24 at 12).  In response, Swain argues only that failing to

29

keep records is no different than destroying records.  The Court concludes that a disputed issue of material fact exists as to whether Swain's statement that Ms. Marten testified to destroying sales invoices was a false statement. In addition, a reasonable jury could determine the finding of probable cause was induced by "other improper means" because Swain's probable cause affidavit included incriminating information obtained from the Martens in violation of their Fifth Amendment rights against self-incrimination.

While a singular omission, false statement or other improper means might not affect an impartial magistrate's determination of probable cause, the Martens have provided sufficient cumulative evidence to show that false statements and omissions in the probable cause affidavit may have improperly induced issuance of the warrants.  In reaching this conclusion, the Court construes the facts in the light most favorable to the Martens as the non-moving party. Although there is evidence in the record from which a jury could reach a contrary conclusion, at the summary judgment stage, "[i]t is not [the court's] role to evaluate the weight of the evidence, to judge the credibility of witnesses or to determine the ultimate truth of the matter, but simply to determine whether there exists a genuine issue of triable fact."  *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007).

### 2.  **Swain's Malice**

With respect to the remaining elements of a malicious prosecution action, it is undisputed that Swain instituted or caused the action to be instituted against the Martens, and the original action was terminated in the Martens' favor. The final element to be established is malice. Malice may be shown "by evidence of personal animosity or inferred from a complete lack of probable cause or a failure to conduct an adequate investigation under the circumstances." *Golden Years Homestead, Inc. v. Buckland*, 557 F.3d 457, 462 (7th Cir. 2009).  While the defendants presented

an argument that the Martens cannot establish the element of malice as to Albrecht, no such argument was made as to Swain (*see* Filing No. 106 at 20-21).  The Martens persuasively point to Swain's egregious conduct throughout much of the criminal proceedings and during the civil investigation leading up to the criminal cases, such as the Fifth Amendment violations, due process violations, and directing service of jeopardy assessments at the same time that the search warrant was being executed, as evidence of malice.  Accordingly, the Court finds that all elements of a malicious prosecution action have been shown to be able to survive summary judgment, and therefore, Swain's Motion for Summary Judgment is **denied**.

**D.**     **Plaintiffs' Related Motion to Withdraw Exhibit**

The Martens filed a Motion for Leave to Withdraw an Exhibit (Filing No. 165), explaining that the exhibit—a declaration of Brad A. Catlin, attorney to the Martens (Filing No. 153-6)— could be misleading in light of case development subsequent to its filing.  They note that the declaration stated that counsel could not find "a copy of 'a September 18, 2007 audit report of J.S. Marten, Inc., prepared by Rick Albrecht' in documents produced in discovery."  *Id.* at 1.  This audit report has since been located in counsel's records with the assistance of the defendants' counsel.  The Martens request leave to withdraw the exhibit so as not to mislead the Court.  Swain and Albrecht have not filed an objection to this Motion.  Therefore, the Court **GRANTS** the Motion to Withdraw the Exhibit filed at Filing No. 153-6.

**IV.     CONCLUSION**

For the reasons stated above, the Court **GRANTS** Defendant Rick Albrecht's Motion for Summary Judgment, and Albrecht is **dismissed** from this action.  The Court **DENIES** Defendant Andrew W. Swain's Motion for Summary Judgment on the sole remaining claim of malicious

prosecution brought pursuant to Section 1983 (Filing No. 105).  The Court also **GRANTS** the

Martens' Motion to Withdraw the Exhibit filed at Filing No. 153-6 (Filing No. 165).

This matter shall proceed to trial as scheduled on the claim of malicious prosecution against

Defendant Swain.

**SO ORDERED.**

Date: 3/16/2017

TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

DISTRIBUTION:

Brad A. Catlin
PRICE WAICUKAUSKI JOVEN & CAITLIN, LLC
bcatlin@price-law.com

Ronald J. Waicukauski
PRICE WAICUKAUSKI JOVEN & CAITLIN, LLC
rwaicukauski@price-law.com

Adam Clay
BLACK CLAY LLC
clay@blackclayindiana.com

Matthew T. Black
BLACK CLAY LLC
black@blackclayindiana.com

Paul Owen Mullin
LEWIS & WILKINS LLP
mullin@lewisandwilkins.com

Molly Elizabeth Harbison
LEWIS AND WILKINS LLP
harbison@lewisandwilkins.com